AMERICAN CIVIL LIBERTIES UNION,
INC., et al., Plaintiffs,

v.

W. Pat JENNINGS et al., Defendants.

Civ. A. No. 1967–72.

United States District Court,
District of Columbia.

Nov. 14, 1973.

Marvin M. Karpatkin, John E. Le-Moult, Melvin L. Wulf, Joel M. Gora, Norman Dorsen, New York City, Hope B. Eastman, Ralph J. Temple, Robert Boraks, Washington, D. C., for American Civil Liberties Union, Inc.

Paul G. Chevigny, New York City, for N. Y. Civil Liberties Union, Inc.

Floyd Abrams, New York City, for the New York Times, amicus curiae.

Harlington Wood, Jr., Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., David J. Anderson, U. S. Dept. of Justice, for defendants.

Before BAZELON, Chief Circuit Judge, and BRYANT and PARKER, District Judges.

## OPINION

PARKER, District Judge:

In this case plaintiffs seek injunctive and declaratory relief against the Clerk of the United States House of Representatives and other government officials charged with the responsibility of supervising and enforcing the provisions of the Federal Election Campaign Act of 1971, Public Law 92–225, 86 Stat. 3 (FECA or Act) and applicable regulations promulgated thereunder, 11 C.F.R. § 1.1 et seq. (Regulations).

Plaintiffs challenge, as violative of the First Amendment, the regulatory procedure adopted to enforce spending limitations in the communications media imposed upon candidates for Federal office by Title I of the Act. They also seek to void, as unconstitutional on their face and as applied, certain provisions contained in Title III of FECA, requiring covered "political committees" to comply with extensive reporting and disclosure requirements.

We find that the challenged provisions of Title I impose impermissible prior restraints and their enforcement is enjoined. We enter a declaratory judgment clarifying and restricting the scope of Title III which removes plaintiffs from its purview.

## FACTUAL BACKGROUND

The underlying facts and the present posture of this litigation can be briefly summarized. In early September 1972, plaintiffs, the American Civil Liberties Union (ACLU) and the New York Civil Liberties Union (NYCLU), non-profit and non-partisan organizations whose named purposes are to protect and to defend rights guaranteed by the Constitution, submitted for publication to The New York Times (Times) a proposed advertisement which expressed their op-

position to the Nixon Administration backed legislation designed to limit court ordered busing. The advertisement, which appears fully as an appendix to this opinion, listed, in the form of an "honor roll," the names of 102 United States Representatives who had previously opposed this anti-busing policy. Plaintiffs were hopeful that through publication of the advertisement public support would be generated favorable to the position they had adopted on this highly publicized and controversial problem of national import. Any intention to aid in the election or re-election campaign of any political candidate has been specifically denied.[1]

The Times, through one of its responsible officers, and on advice of counsel, notified the plaintiffs that their failure to comply with certain certification requirements mandated by Title I of the Act precluded publication of the advertisement.[2] Because those requirements, found in § 104(a) of the Act, as set forth in certain implementing regulations, 11 C.F.R. §§ 4.4 and 4.5, were not satisfied by the plaintiff, the Times, rather than risk criminal penalties under FECA, refused the publication for print.[3]

On the heels of this refusal plaintiffs filed with the Court the present suit challenging the constitutionality of the FECA provisions cited by the Times in rejecting the advertisement, and sought injunctive relief prohibiting their enforcement. Named as defendants along with the Clerk of the House were the Comptroller General of the United States and the Director of the Office of Federal Elections all of whom were authorized and obligated to administer and enforce the Act.

Plaintiffs further challenged and requested the Court to enjoin the enforcement of Title III of the Act, which establishes certain registration, filing and notice requirements for organizations engaged in the political process.[4] In this regard plaintiffs contend that the printing of the proposed communication would, in effect, cause them to be deemed a political committee within the meaning of the Title, thereby compelling them to disclose, *inter alia*, lists of their contributors. Such disclosure, they allege, violates their constitutional right to freedom of association. At no time have the defendants attempted or threatened to enforce the Title III disclosure provisions against the plaintiffs.

Plaintiffs immediately moved for and were denied a temporary restraining order. Because of the constitutional issues presented, a Three-Judge Court was convened pursuant to 28 U.S.C. §§ 2282 and 2284. The Times sought and was granted permission to proceed in this matter as *amicus curiae*, limiting its participation to the issues raised with respect to Title I of the Act.

After full briefing and argument, and despite an eleventh hour amendment of regulation § 4.4,[5] the Court found harbored within the provisions of Titles I and III sufficient First Amendment impediments and restraints to warrant the issuance of a preliminary injunction. Accordingly, the defendants were "en-

---

1. Plaintiffs are forbidden by their by-laws and policies from either endorsing or opposing the election or re-election of candidates seeking public office. See affidavits of Aryeh Neir, Executive Director of ACLU, and Ira Glasser, Executive Director of the NYCLU, sworn to on September 27, 1972 and September 28, 1972.

2. See letter dated September 22, 1972 from James C. Goodale, Senior Vice President, Law and Finance, New York Times, to Mr. Glasser.

3. 11 C.F.R. § 5.5. See footnote 8, infra.

4. Public Law 92–225 § 301 et seq. See text accompanying footnotes 18–21.

5. On the eve of argument on the motion for a preliminary injunction a revised Regulation 4.4 was promulgated which re-defined a communication "on behalf of the candidacy" as one which "identifies the candidate, directly or by implication, *and* advocates or supports the nomination or election of the candidate." (emphasis supplied) 11 C.F.R. 4.4 filed October 18, 1972, appearing in 37 Fed.Reg. 22830, October 19, 1972. Under the original definition the statement need only identify *or* advocate a candidate.

joined, pendente lite, from taking any action against plaintiffs, or any other person, that would have the effect of impeding, hindering, or preventing the acceptance for publication of any advertisements or statements of plaintiffs which are similar to, in purpose and effect, the advertisement or statements which are the subject of this suit; and they (were) further enjoined from threatening, initiating or taking any civil or criminal action in connection with the publication of any such advertisements or statements . . . ." [6]

The threat of prosecution under FPCA having been eliminated, The New York Times published, on October 27, 1972, the revised anti-busing advertisement submitted by the plaintiffs. This advertisement contains in its entirety and embellishes upon, by reference to this suit, the original submission of September, 1972. The defendants thereafter moved to dismiss the action or, in the alternative, for an order granting summary judgment on the merits. Plaintiffs cross-moved for summary judgment and a supporting memorandum was submitted by The New York Times. In support of their motion the government submitted affidavits of two of the defendants stating that in their judgment, as supervisory officials under the Act, the advertisement of October 27, 1972: (a) was not subject to the certification requirements of § 4.4(a) of the regulation as amended, since it neither advocated nor supported the nomination or election of any federal candidate; (b) was subject to the requirements set forth in regulation § 4.5, in that it derogated President Nixon's stand on busing; and (c) would not cause plaintiffs to be designated as "political committees" for Title III purposes and, therefore, would not subject them to the disclosure and reporting requirements found therein.

## THE FEDERAL ELECTION CAMPAIGN ACT

A brief description of the relevant portions of Titles I and III of the Act, to be later elaborated upon, is desirable in order to establish the proper framework within which the jurisdictional issues raised in this litigation must be assessed.

The Federal Election Campaign Act of 1971 was enacted to protect the federal election process from an excessive influence of uncontrolled expenditures by candidates for federal office.

Title I establishes limitations on spending through the communications media by candidates for federal office in either primary or general elections. To effectuate these expenditure limitations a procedure was developed by which any person desirous of publishing an advertisement "on behalf of" such a candidate must first obtain a certification from the candidate that the advertisement does not exceed his spending limitation. The regulations promulgated in connection with this Title further provide that certain certification is required for statements which are "in derogation" of any candidate. Such certification is designed to establish the independence of the sponsor from any candidates for election opposing the candidate "derogated" in the advertisement. Any publication that publishes an advertisement as to which these certification requirements have not been met is subject to criminal penalties.

An implementing regulation of the Title, 11 C.F.R. § 4.4 defines an expenditure "on behalf of a candidate" as one which both identifies the candidate and supports or advocates his election. A second regulation, § 4.5 provides a mechanism through which expenditures made by a candidate to derogate an opponent are charged to his spending limitation. This latter regulation provides that the sponsor of the derogatory advertisement either indicate the source of the ad or

---

6. The Order granting Preliminary Injunction and accompanying Findings of Fact and Conclusions of Law, issued on October 26, 1972.

provide a disclaimer that no opposing candidate has authorized the same. If a statement of non-authorization is submitted the seller of the advertising time or space is then required to take reasonable precautions, before charges are assessed, to verify the accuracy of the disclaimer.

Title III requires that any group expending $1,000 "for the purpose of influencing" an election comply with certain complex registration, disclosure and reporting provisions. The Title designates such groups as "political committees," thereby triggering the filing and reporting requirements, which include the public disclosure of information concerning the committee's name, address, officers, purposes, funds and contributions, as well as the full identity of persons who contribute any amount or value in excess of $100 in any one year. The Title also details record keeping procedures required of "political committees."

## JUSTICIABILITY

In order to reach the merits of the claims presented by the plaintiffs, the Court must first determine whether the issues are justiciable. Relying heavily upon the affidavits of the officials charged with responsibility of supervising the Act, the defendants dispute the existence of a case and controversy suitable for adjudication. They urge the Court to avoid any possible constitutional confrontations by refraining from, or drastically limiting, its review of the substantive issues raised in this litigation. We are left unpersuaded by that

argument. Because of the nature of the asserted claims and the factual context within which they have arisen, the plaintiffs present a case, as to both Titles, sufficiently real and controversial so as to permit this Court to consider the merits.

### Title I of the Act

■ As to Title I the government asserts that, within the framework of this suit, there is no basis for challenge since the officials charged with the responsibility of administering FECA, after careful review, have concluded that the October 27th advertisement statement is not "on behalf of" the candidacy of any Federal office-seeker. In view of this, the government then argues that the Times would not have been in violation by charging for the publication without certification from the listed Federal candidates.[7] The proposed ad, as viewed and commented on in the affidavit of the defendant Hughes, focused more on issues than on candidates and the fact that the favorably mentioned 102 congressmen had not provided appropriate FECA certification would not subject the newspaper to the criminal penalties provided in the Act.[8] Although they regarded the advertisement as denigrating a position of the President, and as such was subject to the requirements of § 4.5, they argue that, in the absence of any enforcement action by them, this situation lacks the degree of ripeness required of a justiciable case or controversy within the meaning of Article III.

These contentions must be rejected. There is little doubt that when the

7. Section 4.11(a) of 11 C.F.R. provides in pertinent part:

No person may make any charge for the use of any newspaper, magazine, or outdoor advertising facility by or on behalf of any legally qualified candidate for Federal elective office (or for nomination to such office) unless the candidate, or an individual specifically authorized by the candidate in writing to do so, certifies in writing that the payment of such charge, including any agent's commission allowed the agent by the media, will not violate the expenditure limitation applicable to the candidate for the election in connection with which the newspaper, magazine, or outdoor advertising facility is used.

8. 11 C.F.R. § 5.5 further provides as follows:

Any person who willfully and knowingly violates any provision of Sections 103(b), 104(a) or 104(b) of the Act or any regulation of this subchapter shall be punished by a fine of not more than $5,000 or by imprisonment of not more than five years or both.

plaintiffs filed this proceeding, immediately after the Times refused to accept for publication the advertisement, they were suffering real and immediate harm as a result of Title I's requirements— harm giving rise to a controversy clearly ripe for adjudication. The Court recognizes that the criminal sanctions contained in this Title would never directly threaten the plaintiffs, and that they apply only to the communications media. But in this case, obviously cognizant of and understandably eager to avoid potential liability under the Title, the newspaper refused to accept the advertisement. Nor does the record indicate an absence of good faith by the Times or that the parties had in any manner contrived this litigation. Thus, the plaintiffs were exposed to a prior restraint on their right to speak, a restraint enforced by a private party, the Times, under the threat of criminal sanctions imposed by Title I. Had this Court not enjoined the enforcement of the Act, the plaintiffs would have been stymied in their attempt to air their views on a matter of national interest.

The representations set forth in the Hughes and Jennings affidavits are insufficient to render issues moot which were plainly ripe at the outset. This litigation presents—in near classic form —a situation involving challenged governmental policy which is "capable of repetition, yet evading review." See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); In re Ballay, 157 U. S.App.D.C. 59, 482 F.2d 648, 651 (1973); Dash v. Commanding Officer, 307 F.Supp. 849 (D.S.C.1969), aff'd 429 F.2d 427 (4th Cir. 1970), cert. denied 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1971).

In urging the Court to accept as controlling the opinions of the supervisory officials of the Act, the government relies upon Law Students Research Council v. Wadmond, 401 U.S. 154, 91 S.Ct. 720, 27 L.Ed.2d 749 (1971). That case presented a challenge, on First Amendment vagueness and overbreadth grounds, to certain provisions of the New York Civil Practice Law and Rules requiring Bar applicants to establish their belief in our form of government. In rejecting the applicants' contentions, the Supreme Court significantly noted that the very named defendants charged with enforcing the admission requirements had for many years adopted a limited and narrow interpretation of the rule, thereby rescuing it from any constitutional infirmity. An administrative policy and interpretation of long standing was found to have had virtually become official policy, uniformly and consistently applied by the defendants.

But such is not the case here. This Act is far too new for its administrators to have developed a consistent and generally recognized policy such as that approved by the Court in Law Students Research Council. Without impugning the good faith of the FECA supervisory officials, their affidavits, as they relate to Regulation § 4.4 of Title I, appear to be an attempt to "moot a case that is live in its inception by promising to conform to plaintiffs' wishes." Such an attempt was rejected by a Three-Judge Court in Green v. Connally, 339 F.Supp. 1159, 1170 (D.D.C.1971). Defendants' affidavits do little more than express an administrative judgment as to this particular advertisement, a judgment which is by no means unalterable and which, to be sure, is highly discretionary.[9]

Plaintiffs have in the past submitted, and plan to submit in the future, adver-

---

9. It is significant to note that the Government Accounting Office adopted a different position with respect to the applicability of Title III to an ad carried in the Times by the National Committee for Impeachment, which became the subject of separate litigation and serves as the basis of the recent opinion by the Court of. Appeals for the Sec-

ond Circuit in United States v. National Committee For Impeachment, 469 F.2d 1135 (2d Cir. 1972). The constitutional issues raised in that case were similar to those here presented but were never reached by the Second Circuit. 469 F.2d at 1138. See pp. 1056–1058, *infra.*

tisements similar in purpose and effect to that now under consideration. But there is nothing found in the government's present position which would shed light on their possible attitude toward an advertisement of a similar nature but of sufficient difference so as to create uncertainty about the applicability of FECA. Government counsel has candidly admitted that should such a situation arise, plaintiffs would be free to pursue another cause of action and seek protection of their rights. But in the meantime, of course, their advertisement would presumably remain unpublished. To that extent, the governments' position, rather than demonstrating this Court's lack of jurisdiction, highlights the need for a substantive determination. The issues here presented have the markings of developing into what can be fairly described as a continuous, ongoing controversy unless full jurisdiction is accepted and a decision on the merits is rendered.

Nor can it be treated as insignificant that the Findings of Fact and Conclusions of Law accompanying the Order Granting Preliminary Injunction reflected a determination by this Court that the provisions of Title I (as well as those of Title III) were made applicable to plaintiffs by the publication of the advertisement. At that time the government, through memoranda and argument, urged the Court to accept the same conclusions later drawn by the two affidavits which comprised the thrust of their threshold argument. The differences between the conclusions reached by the Court based upon the facial requirements of FECA and those drawn by defendants in part reflects the ambiguity and uncertainty surrounding a statute which, unless judicially clarified, may open a pandora's box of future problems.

### Title III of the Act.

The constitutional problems presented by Title III come before the Court in a context considerably different from those presented by Title I, and the juris-

dictional question is not as easily resolved. While we conclude that Title I has an immediate impact upon the plaintiffs, in the form of a prior restraint, the effects of Title III upon those litigants' First Amendment rights have not been so clearly demonstrated.

The government contends that the Court lacks jurisdiction since in fact no present controversy exists. The plaintiffs, they point out, are not threatened with Title III enforcement nor does the government, on the basis of the advertisement that generated this suit, consider either the ACLU or the NYCLU as political committees under Title III standards. In these circumstances, they argue, there is no question of Title III's constitutionality properly before the Court. Plaintiffs reply, however, that even in the absence of Title III enforcement, and notwithstanding defendants' assertions that plaintiff organizations are without the scope of the Title, the overly broad and vague standards found therein constitute an imposing chilling effect upon the present and future free exercise of First Amendment rights.

■ The previous analysis of Title I jurisdiction discounted the weight to be accorded the affidavits of the defendants. Those observations are equally applicable to claims asserted by the defendants as to Title III. The government's reliance upon their announced interpretation and assessment of the issues at hand is misplaced and will not cause this Court to abstain from considering the merits of this matter. We are of the opinion, however, that there having been no threat of enforcement under Title III, and since the record does not otherwise reflect facts sufficient to establish the imminence of harm to the plaintiffs, permanent injunctive relief is inappropriate. Declaratory relief, on the other hand, appears clearly warranted under the circumstances. The propriety of such relief was noted in Justice Brennan's separate opinion in Perez v. Ledesma, 401 U.S. 82, 93, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). There, in

an observation particularly applicable here, he counseled:

"Declaratory relief should be available, whether the conduct inhibited is expressive or other conduct alleged to be protected by the Constitution. Of course, the special sensitivity and importance of First Amendment rights (their sensitivity to "chilling") is a necessary consideration in evaluating the claim of inhibition. The deterrence emanating from the existence of a statute purporting to prohibit constitutionally protected expression is itself plainly inconsistent with the First Amendment . . . ."

401 U.S. at 117, n. 10, 91 S.Ct. at 693, citations omitted. He added:

The federal declaratory judgment is not a prize to the winner of a race to the courthouses, but rather a declaration of rights that obviates the need to risk a . . . criminal proceeding or a race to the courthouses. Within the limits of Art. III, see Golden v. Zwickler, 394 U.S. 103 [89 S.Ct. 956, 22 L.Ed.2d 113] (1969), doctrines of ripeness should be so fashioned as to give adequate room for this kind of relief. 401 U.S. at 119 n. 12, 91 S.Ct. at 694.

Plaintiffs allege that as controversial organizations the imposition of the reporting and disclosure requirements, presumably made operative by the publication of the advertisement, would result in an unconstitutional abridgment and chilling of their rights of freedom of association and privacy guaranteed by the First, Fourth and Ninth Amendments.[10] They contend that the existence of the statute, in its present form, leaves forever open the possibility of enforcement against them as well as other non-partisan, non-political groups, thereby placing them in the difficult and untenable position of, on the one hand, having to decide whether they will exercise First Amendment rights, i. e. publish material

similar to that which prompted this litigation, and in so doing risk being caught within the Title III net of reporting and disclosure requirements, thereby sacrificing other constitutional rights of association and privacy, or, on the other hand, forego these former rights to protect the latter. The potential for such a situation, with its clear likelihood of causing chilling effects upon plaintiffs, leads us to conclude, following Justice Brennan's *Perez* approach, that the Title III questions are ripe for declaratory action.

### THE MERITS

#### Title I of the Act

The plaintiffs do not question the authority of Congress to pass legislation regulating Federal elections. Indeed, authority in that area appears to rest on solid foundation. United States v. International Union United Automobile, Aircraft and Agricultural Implement Workers of America, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); Burroughs and Cannon v. United States, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484 (1934). They do challenge, however, certain procedures and requirements adopted to secure adherence to the general policies established by the Act.

In Title I, § 104(a)(1) of the Act, total monetary limits are established on spending in the communications media by candidates for Federal elective office. Section 104(b), designed to implement the enforcement of these limitations, creates a monitoring procedure which provides that:

"No person may make any charge for the use by or on behalf of any legally qualified candidate for Federal elective office (or for nomination to such office) of any newspaper, magazine or outdoor advertising facility, unless such candidate (or a person

---

10. Affidavits of Ira Glasser and Aryeh Neier, Executive Directors of the NYCLU and ACLU respectively reflect that members in these organizations have in the past been subject to harassment and reprisals which have led many members to seek assurances that their names not be disclosed.

specifically authorized by such candidate in writing to do so) certifies in writing to the person making such charge that the payment of such charge will not violate [the spending limitation]."

It is but a common sense observation that unless charges can be made for its services, the media will simply refrain from publishing any advertisement which lacks the requisite certification. Thus it becomes apparent that with this provision Congress has charged the media with first-line responsibility to enforce, by refusal to publish, the requirements of the Act.

Under authority granted by § 105 the Comptroller General promulgated two regulations, 11 C.F.R. §§ 4.4 and 4.5 [11] which supplement and clarify § 104(b).

11. The applicable portions of these Regulations read as follows:

§ 4.4

(a) "Any expenditure by any person for the use of communications media on behalf of the candidacy of any legally qualified candidate for nomination or election to Federal elective office is deemed, for the purposes of section 104 of the Act and this part, to have been spent by such candidate, whether or not the person making the expenditure is authorized by the candidate to do so. An expenditure for the use of communications media is deemed to be 'on behalf of the candidacy' of such Federal candidate if the use identifies the candidate, directly or by implication, and advocates or supports the nomination or election of the candidate. Any such expenditure by or on behalf of any legally qualified candidate for the office of Vice President of the United States is deemed, for the purposes of section 104 of the Act and this part, to have been spent by the candidate for the office of President with whom he or she is running,

(b) The amount of any such expenditure under paragraph (a) of this section shall be charged against the applicable expenditure limitation of the candidate under section 104(a) of the Act and this part. Under section 104(b) of the Act and § 4.11 of this subchapter, no person may make a charge for such use of any newspaper, magazine, or outdoor advertising facility unless the candidate (or his specially authorized agent) certifies in writing that payment of the charge will not violate the candidate's applicable expenditure limitation under section 104(a) and this part. The same prohibition on charges for the use of broadcasting stations is contained in section 104(c) of the Act, subject to regulations or guidelines by the Federal Communications Commission.

§ 4.5

(a) An expenditure for the use of communications media opposing or urging the defeat of a Federal candidate, or derogating his stand on campaign issues, shall not be deemed to be an expenditure for the use of communications media on behalf of any other Federal candidate and shall not be charged against any other Federal candidate's applicable expenditure limitation under section 104(a) of the Act and this part, unless such other Federal candidate has directly or indirectly authorized such use or unless the circumstances of such use taken as a whole are such that consent may reasonably be imputed to such other candidate.

(b) In the case of any expenditure under paragraph (a) of this section, the person selling the space or time for the use of the particular communications medium shall determine the identity and organizational affiliation, if any, of the person making the expenditure and shall require such person to state in writing whether or not he is authorized by any Federal candidate to make such expenditure, or whether any Federal candidate has given his consent to it.

(c) If the person making the expenditure states in writing that any such candidate has authorized or consented to the expenditure then no person may make any charge for such use, unless the candidate (or his specially authorized agent) certifies in writing, in accordance with § 4.11, that payment of such charge will not violate his applicable expenditure limitation.

(d) If the person making the expenditure states in writing that no Federal candidate has authorized or consented to the expenditure, then a charge may be made for such use, provided that the person selling the space or time has taken reasonable precautions under the particular circumstances to verify the identity and affiliation of such person and the accuracy of the written statement. Any reasonable doubt as to whether authorization or consent to the expenditure may be imputed to a Federal candidate should be resolved by the person selling the space or time in favor of requiring a certification from a Federal candidate or his authorized agent, as required under § 4.11, before making the charge.

(e) Any advertisement or use under paragraph (d) of this section shall contain, conspicuously displayed, the name and address of the person making the expenditure, and, in the case of an organization,

Section 4.4(a) of the Regulations, as amended, defines communications media expenditures made "by or on behalf of any legally qualified candidate . . . to Federal elective office," as that phrase relates 'to § 104(b), as those which (1) identify the candidate, either directly or by implication and (2) advocate or support the election or nomination of that candidate. If these dual requirements are met, amounts so spent are credited against the candidate's spending limitation. Under § 4.4(b) the media are prohibited, subject to criminal penalty, from charging for such a communication unless the candidate identified and supported therein certifies that any amount spent does not exceed the candidate's applicable expenditure limitation.

The second Regulation, § 4.5, is complimentary to § 4.4, and has been branded as crucial to the vitality of Title I. It is far more complex than the latter regulation and presents serious constitutional questions. Although the Act itself omits reference to statements which seek to discredit or derogate a candidate for political office, the Comptroller General, acting pursuant to congressional approval, has prescribed regulations designed to prevent the easy circumvention of § 4.4 by the expenditure of funds urging the defeat of an opponent rather than advocating one's own election.[12]

Regulation § 4.5 was promulgated to close this apparent loophole. Subsection § 4.5(a) provides that amounts spent in derogation of a candidate are not chargeable to any other candidate unless the other candidate has "directly or indirectly authorized such use or unless the circumstances of such use taken as a whole are such that consent may reasonably be imputed to such other candidate." (Emphasis added). Once the communications media determines that a particular communication falls within §

4.5(a), and before charges can be made for such an advertisement, § 4.5(b) requires the person seeking publication to identify his organization affiliation and furnish written certification as to "whether or not he is authorized by any Federal candidate to make such expenditure, or whether any Federal candidate has given his consent to it." Subsection 4.5(c) further requires that, should representation be made that a candidate has either authorized or consented to the derogatory communication, that candidate must certify that any expenditures made in connection with said advertisement were not in violation of the established spending ceiling. If, however, the would-be advertiser states in writing that no Federal candidate has given authorization or consent the provisions of § 4.5(d) become operative. This regulation requires the media, before they may charge for the advertisement, to take "reasonable precautions under the particular circumstances to verify the identity and affiliation of such person and the accuracy of the written statement." Any reasonable doubt as to the need for candidate certification must be resolved in favor of requiring the appropriate representations.

Within this framework, § 104 of the Act and its implementing regulations require that the media, before making regular charges for publication, be assured —in fact, take reasonable steps to substantiate any assurance—that presumably valid requirements imposed by Congress upon Federal office seekers, and those actively supporting or opposing such candidacy, have been satisfied. Publication without these representations, on the one hand, makes the media vulnerable to criminal prosecution. In this respect, Title I is tantamount to government prescription of what may or may not appear in public print. On the other hand, compliance with the certifi-

---

the name of the individual authorizing the expenditure. Such advertisement or use shall also contain, conspicuously displayed, a statement that the use is not authorized, directly or indirectly, by any Federal can-

didate and that no Federal candidate is responsible for any activities of the person making the expenditure.

12. See Report of the Conference Committee on S.382 (H. Rept. 92-725).

cation requirements is nothing less than the enforcement of a system of prior restraints upon publication.

Attempts to impose prior restraints have been consistently met with judicial disfavor. See, e. g., New York Times Co. v. United States, 403 U.S. 713, 91 S. Ct. 2140, 29 L.Ed.2d 822 (1971); Freedman v. Maryland, 380 U.S. 51, 59–60, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Blount v. Rizzi, 400 U.S. 410, 418, 91 S. Ct. 423, 27 L.Ed.2d 498 (1971); Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). It is in this context that we turn to an analysis of Title I.

We begin by recognizing that the speech here involved, a statement of opinion published in a newspaper of national circulation concerning an issue of vital public concern, is, as Justice Brennan observed, ". . . more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). In Mills v. Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L. Ed.2d 484 (1965), a state law prohibiting a newspaper from making political comment on election day was invalidated; in so doing the Supreme Court made observations which are relevant here:

> "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." 384 U.S. at 218–219, 86 S.Ct. at 1437.

■ Any attempt to restrict the free and unfettered dissemination of such opinions can not be favorably viewed. The fact that restrictions have been imposed in furtherance of matters of legitimate governmental concern is neither dispositive nor, in this instance, persuasive. The now classic maxim delivered by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819), acknowledges the existence of, and provides guidance as to the reconciliation of valid yet competing interests:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

This rationale was followed by Chief Justice Warren in United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed. 2d 508 (1967), wherein a provision of the Subversive Activities Control Act of 1950 was struck down. The Court there declined to adopt the so called "balancing test" approach but instead ruled, following principles of constitutional construction appropriate to this case, that the manner chosen to achieve the admittedly legitimate governmental goal was unconstitutional:

> "Faced with a clear conflict between a federal statute enacted in the interests of national security and an individual's exercise of his First Amendment rights, we have confined our analysis to whether Congress has adopted a constitutional means in achieving its concededly legitimate legislative goal." 389 U.S. at 268, n. 20, 88 S.Ct. at 426.

Title I of the Act establishes impermissible prior restraints, discourages free and open discussion of matters of public concern and as such must be declared an unconstitutional means of effectuating legislative goals.

Of course, the prior restraints at issue in this case are not imposed by the Government directly. But the fact that censorship is indirect, accomplished by means of criminal sanctions directed to the media, in no way diminishes its constitutional infirmity. On the contrary, we think the unconstitutionality of these prior restraints is, if anything, aggravated by the means chosen to enforce them.

Exposure to criminal penalties under Title I and the Regulations [13] places a severe and unnecessary burden upon the communications media to determine whether or not the proposed advertisement should be designated as being made on behalf of a candidate. If the media are not satisfied that the advertisement falls outside FECA's scope, and if the required certification is indeed lacking, the advertisement will not be published.

This problem, although of independent severity, is magnified by the failure of Congress to define clearly the crucial phrase "on behalf of a candidate" so as to exclude from its coverage expressions of opinion unintended and incapable of regulation. In view of such imprecision, it is quite conceivable, as the background of this suit so pointedly evidences, that organizations similar to plaintiffs (non-partisan and politically unaffiliated) may submit matters for print which, although issue oriented, will nevertheless be viewed by the media, and understandably so, as requiring FECA certification. The fact that the supervisory officers may later conclude differently does not vitiate the First Amendment infirmities presented by Title I, the terms of which are, or at least should be, designed in part to offer guidance to media personnel charged with the delicate responsibility of determining the applicability of FECA. These individuals, not the defendants, must in the first and crucial instance interpret and evaluate the strictures of the Act as they relate to a particular proposed communication. Having not

only been placed in the unenviable position of enforcers of this statute, which is aimed at regulating politicians and not the media, but also faced with criminal sanctions for any questionable performance of this duty, the press is entitled to, and the Constitution demands, proper guidance free from ambiguity and vagueness:

> ". . . a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth v. Birmingham, 394 U.S. 147, 150–151, 89 S.Ct. 935, 938, 22 L. Ed.2d 162 (1967).

Although Title I does not technically constitute a licensing system, the effects of its procedure are sufficiently comparable so as to permit this Court to apply that principle.[14]

Each time an advertisement is submitted which relates to matters of public concern and in which candidates for federal office are in some way identified the media must determine whether the message is affirmatively "on behalf" that candidate, or if it is in denigration of any opposing candidate. The legislation provides scarce definitional or clarifying assistance under which the seller of advertising space can confidently proceed.[15] Considering the penalties involved and the presumptions built into the Regulations it is reasonably predictable, if not certain, that any and all doubts will be resolved in favor of re-

---

13. See fn. 8, *supra*.

14. To the extent, then, that the language suffers from vagueness, the Title itself becomes overbroad in its application, reaching beyond its permissible scope of control. We are thus presented with a situation where the doctrines of "vagueness and overbreadth are, plainly, closely intertwined." Paris Adult Theatre I, et al. v. Slaton, et al., 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 dissenting opinion of Brennan, fn. 10 at 60, 93 S.Ct. at 2650. The dangers of statutes which are overbroad and/or vague have been recounted on many occasions and need not be repeated. See e. g. Ginsberg v. New

York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed. 2d 195 (1968); United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

15. The statute's imprecision has led one commentator to raise the question which strikes at the jugular of the problem and which unfortunately remains unanswered by the Act and its Regulations: "when does advocacy of a principle end and support of a candidate begin?" Rosenthal, Campaign, Financing and the Constitution, 9 Harv.J.Legis. 359, 393 (1971).

quiring the certification.[16] The end result is either that the affirmatively named candidates must give the necessary certification or the person or organization submitting an ad deemed "derogatory", as the government contends was done in this case, must certify non-affiliation. In either case, groups similar to plaintiff will be forced to adhere to and be restrained by a system of prior restraints. Anyone wishing to voice views on public issues which inherently touch upon Federal candidates and their positions, must first either 1) obtain the imprimatur of a candidate on whose side they may be allied concerning any given issue or 2) in the case of "derogatory" statements they must make representation as to non-authorization or non-consent.

However, it must be borne in mind that, in the latter situation, the media is obligated to require a § 4.4 certification from opposing candidates whenever their consent may be reasonably implied under the circumstances. The deleterious effects of this Title upon the First Amendment can readily be demonstrated. Candidates favorably named in ads, or those whose consent to derogatory advertisements may be implied, are provided with the opportunity of effectively blocking publication by refusing to make the requisite certification statements. They simply may not desire, for political reasons or otherwise, their names associated with certain organizations, notwithstanding the complimentary tone or benefit derived from the communication. By refusing to comply with the Act's requirements, any such candidate wields potential veto power over attempts to communicate public views. This presents additional and grave constitutional questions of a candidate's ability to bridle a citizens' or an organizations' right to speak "on that candidates behalf," even as that term is defined in the amended version of Regulation § 4.-4(a). Such support might prove embarrassing or detrimental to the candidate's campaign, in which case the candidate is free to reject such support. But the airing of opinion in a public forum must not be subordinated to political expediencies. The final authority given to a candidate under the Act to prohibit the expression of views made on his behalf, albeit by those from whom he may wish to be disassociated, presents an opportunity for such subordination and in so doing may dampen the free and robust ventilation of opinion.

If an advertisement falls within the derogatory category, the advertiser must, to the satisfaction of the media, establish that there has been no authorization of, or consent, either implied or actual, by Federal candidates opposed to the denigrated candidate. The requirements levied upon the press in this regard—to establish the veracity of non-authorization or non-consent statements—place a burden upon the press (significantly nowhere delineated or elaborated upon)[17] to look behind any representations of the communicator. Whatever imprecision may exist in the language of § 104, Regulation § 4.5 leaves no doubt that the media *must* take certain precautions with regard to derogatory ads and that any doubts must be resolved in favor of requiring § 4.11 certifications. These prior steps to publication carry with them the ominous threat of preventing the publication of views by persons and organizations not intended to be covered by the Act.

These required procedures of both the media and the advertiser, considered in conjunction with the relative ease with which a candidate may prevent publication, create the prohibited previous restraints.

---

16. Consider the mandates of regulations § 4.-5 which specifically require such an interpretation. See fn. 11, *supra.*

17. Government counsel during argument suggested that in this situation a mere phone call to the organizations would suffice—but could not elaborate on what § 4.5 would require in situations where the person offering the communication for publication was less widely known.

The government has failed to demonstrate that such restraints are necessary and appropriate to achieve the legislation's purposes. Any governmental attempts to impose prior restraint procedures, whether directly or indirectly, must overcome "a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). The aims of the Act, although clearly of prime national concern, alone fail to provide satisfactory justification for the strained procedure established under Title I and its Regulations. Since the Title's constitutional infirmities—its prior restraints and criminal sanctions directed to the press—inhere in the enforcement structure that it creates, they cannot be removed by a narrowing construction drawn by the Court. The coupling of these First Amendment impediments with the Act's ill-defined standards leaves the Court no choice but to declare § 104(b) facially unconstitutional. Accordingly, we permanently enjoin its enforcement.

### Title III of the Act

Title III of FECA, entitled Disclosure of Federal Campaign Funds, establishes an elaborate system of record keeping and public disclosure of campaign contributions and expenditures of "any committee, association, or organization which accepts contributions or makes expenditures during a calendar year in an aggregate amount exceeding $1,000." [18]

An expenditure, in turn, consists in pertinent part of:

"a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of influencing the nomination for election, or election, of any person to Federal office or as a presidential or vice-presidential elector, or for purpose of influencing the result of a primary held for the selection of delegates to a national nominating convention of a political party or for the expression of a preference for the nomination of persons for election to the office of President, or for the purpose of influencing the election of delegates to a constitutional convention for proposing amendments to the Constitution of the United States." [19]

Categorization as a political committee sets into motion certain detailed disclosure and reporting requirements. Most significant are the provisions of § 304(b)(2) requiring the treasurer of a political committee supporting a candidate or candidates for election to file with the supervisory officers a report setting forth the name, address, occupation or business of each contributor to a political committee or candidate within the calendar year in aggregate amount or value in excess of $100. [20]

Plaintiffs challenge the validity of these requirements, the gravamen of their position, as we understand it, being that the vague and unclear terms of Title III allow for its potential appli-

---

18. § 301(d)

19. § 301(f)(1)
Contributions, which include gifts, subscriptions, loans, advances, deposits or gifts of money or anything of value, are identically defined. § 301(e)(1).

20. Other requirements of Title III include: All contributions in excess of $10 must be reported to the treasurer together with the name, address, occupation and place of business of the contributors, § 302(b); the treasurer must maintain detailed and exact accounts of expenditures and contributions, § 302(c); the treasurer is to retain a receipt for each expenditure in excess of $100, §

302(d). Furthermore, § 302(e) provides that:
"Any political committee which solicits or receives contributions or makes expenditures on behalf of any candidate that is not authorized in writing by such candidate to do so shall include a notice on the face or front page of all literature and advertisements published in connection with such candidate's campaign by such committee or on its behalf stating that the committee is not authorized by such candidate and that such candidate is not responsible for the activities of such committee."

cation to plaintiffs, resulting in an intrusion upon their rights of freedom of association and privacy guaranteed by the First, Fourth and Ninth Amendments.[21]

Under the Title political committees are defined as groups which receive contributions or spend in excess of $1,000.00 yearly "for the purpose of influencing" the election of federal candidates. That crucial phrase is nowhere expounded upon,[22] leaving plaintiffs to argue that by reason of such purported vagueness, organizations which express views on topical issues involving, by their very nature, positions adopted by office-seekers, but which are entirely independent of any federal candidate, may be compelled to comply with the reporting and disclosure sections of the Act. In plaintiffs' view, compliance "forces persons and organizations to attempt to choose among unhappy alternatives of foregoing political activity, engaging in it without· complying with the statute, thereby risking criminal penalty, or complying with the statute at the sacrifice of the right to political anonymity and associated privacy." [23]

■ It is well established that the requirements of public disclosure and reporting of membership lists cast a chilling effect upon an individual's right to associate freely and to voice personal views through organizational ties. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In *NAACP*, Mr. Justice Harlan placed the principle in focus as a unanimous court declared un-

constitutional an Alabama statute requiring that civil rights organization to reveal the identity of its members:

"It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association . . . . This Court has recognized the vital relationship between freedom to associate and privacy in one's own association." 357 U.S. at 462, 78 S.Ct. at 1171.

Any such infringements would flow to plaintiffs, however, only if their conduct, presumably in this instance spending to print the anti-busing advertisement, would cause them to be regulated by Title III.

It seems apparent, therefore, that plaintiffs' claims will stand or fall upon the constitutional . soundness of Title III's definitional language. For if its provisions, as properly interpreted, do not encompass the activities engaged in by plaintiffs, the constitutional issues need not be reached.

· Adherence to First Amendment principles requires that standards designed to guide administrative officials must be drawn clearly and precisely. *Cf* Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). To do otherwise would risk the arbitrary and unwarranted application of Title III to groups whose conduct was obviously not intended to be regulated by the Act.

Title III delegates to the enforcement personnel wide authority to administer this significant piece of legislation, but

---

21. See pp. 1047–1048, *supra*.

22. In United States v. National Committee For Impeachment, 469 F.2d 1135 (2d Cir. 1972) which we shall later deal with in greater detail, (See pp. 1056–1058, *infra*) the Court in commenting upon the terms of Title III noted at p. 1139:

"The Senate Report, S.Rep.No. 92–96, 92nd Cong. 2d Sess., 1972, U.S.Code Cong. & Ad.News, p. 45 et seq., which is particularly important because the Senate Bill was the one passed in lieu of the House bills, may be searched in vain for any pas-

sage which throws further light upon the meaning of 'political committee' or 'made for the purpose of influencing.' Here as elsewhere Congress 'has voiced its wishes in muted strains and left it to the courts to discern the theme in ·the cacophony of political understanding." Rosado v. Wyman, 397 U.S. 307 [397], 412, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970).

23. Plaintiffs' Memorandum Of Law In Support Of Their Motion For A Preliminary Injunction, p. 30, October 11, 1972.

its provisions, as they presently exist and unless judicially narrowed, provide inadequate standards by which the supervisory officers are to be guided, leaving open the possibility that these administrators, acting in the best of faith and in full accord with what they believe to be the scope and breadth of the statute from which their authority stems, may nonetheless interpret Title III so as to require disclosure statements from groups and organizations whose regulation is beyond the purview of the Act.[24] Unless the potential for such unwarranted application is eliminated controversial organizations, such as the plaintiffs,[25] and their members, who fall outside the proper boundaries of Title III, will be confronted with serious abridgements of constitutionally protected endeavors.

■ A declaration of unconstitutionality being so serious a matter, it is incumbent upon us to avoid unnecessary confrontations by attaching to the statute in question, if at all possible, a construction which is compatible with its plain language, consistent with the underlying rationale and free from constitutional deficiencies. The judiciary must give to federal legislation a ". . . meaning that may fairly be attributed to it, having special regard for the principle of constitutional adjudication which makes it decisive in the choice of fair alternatives that one construction may raise serious constitutional questions avoided by another." United States v. Rumely, 345 U.S. 41, 45, 73 S. Ct. 543, 545, 97 L.Ed. 770 (1953).[26]

Plaintiffs' assertions to the contrary, we are of the opinion that the contested operational language of Title III is susceptible to a limited and narrow construction which will at once remove any chilling effects worked upon the plaintiffs as well as obviate the necessity of this Court having to invalidate the Title. Indeed, one Circuit Court has so held. In United States v. National Committee For Impeachment, 469 F.2d 1135 (2d Cir. 1972) a ruling upon acknowledged serious constitutional questions surrounding the scope of Title III was avoided by holding that an advertisement published by the defendant, which was strikingly similar in form to the one with which we are here concerned,[27]

---

24. To the extent that Title III is less than unambiguous it represents a Congressional failure to make a legislative determination. See Cantwell v. Connecticut, 310 U.S. 296, at 307, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). As Professor Bickel has stated:

"A vague statute delegates to administrators, prosecutors, juries, and judges the authority of *ad hoc* decision, which is in its nature difficult if not impossible to hold to account, because of its narrow impact. In addition, such a statute delegates authority away from those who are personally accountable, at least for the totality of their performance, to those who are not, at least not directly. In both aspects, it short circuits the lines of responsibility that make the political process meaningful. A. Bickel, The Least Dangerous Branch at 151.

25. The government has not challenged plaintiffs' self-characterization.

26. Our ruling as to Title I is not inconsistent with this principle. Since those provisions constitute unwarranted prior restraints a declaration of facial unconstitutionality is in order. Clearly, any judicial attempt at statutory surgery could not rectify this impermissible scheme. As we have endeavored to point out, any vague or overbroad language accompanying Title I procedure merely makes the section more onerous. Even if the words lend themselves to a restrictive reading, and on this we pass no judgment, the illegal requirements would nonetheless exist and the damage to the First Amendment would continue.

27. In that case the government sought to enjoin the defendant committee from continuing to function as a political committee, primarily in their receipt of contributions and expenditure of funds, unless and until the reporting and disclosure requirements of the Act were adhered to. It was unsuccessfully argued by the government that the publication of a two-page advertisement in The New York Times calling for the impeachment of President Nixon opened the defendant to liability under Title III. As does the advertisement involved in this suit, the resolution of impeachment contained an Honor Roll of Congressmen who were in support of the position taken by the National Committee For Impeachment.

was in and of itself insufficient to classify the sponsor as a political committee. Noting that the legislative history surrounding the Act [28] revealed that "[c]ongressional concern was with political campaign financing, not with the funding of movements dealing with national policy," 469 F.2d at 1141–1142, the Court promulgated a dual statutory test limiting the reach of Title III: (1) the determinative phrase "made for the purpose of influencing," is to include only those expenditures "made with the authorization or consent, express or implied, or under the control, direct or indirect, of a candidate or his agents," and (2) Title III is applicable "only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates." 469 F.2d at 1141.

We are in full agreement with that reading of Title III, finding, as did the Second Circuit, such a construction to be in satisfactory accord with the primary concern of the Act, namely that of campaign reform and the problems attendant to the alarming skyrocketing of candidate expenditures. We are satisfied that by so constricting the reaches of Title III the fears of constitutional infringements expressed by plaintiffs will be eliminated. They and other groups concerned with the open discourse of views on prominent national issues may, under both this ruling and that of the Second Circuit, comfortably continue to exercise these rights and feel secure that by so doing their associational rights will not be encroached upon.

In light of the foregoing we now conclude that plaintiff organizations, on the basis of the advertisement, are not subject to Title III regulation. The government's acquiescence in that conclusion notwithstanding, the protection of constitutional rights requires that the vagueness surrounding Title III complained of in this suit be removed. The clarification of the Title and the declaratory judgment are designed to meet that end. We wish to make clear, however, that by this holding we have only addressed the scope of Title III and do not pass upon any constitutional problems that the Title, even as construed, may present. We do not mean to imply that if Title III were applied only to groups properly within its scope it would present no constitutional problems. We hold only that, in any event, these plaintiffs, at least in the circumstances here are not subject to Title III as properly construed.

Judgment accordingly.

---

28. *See* Senate Report No. 92–96, 92nd Cong. 2d Sess.1972, U.S.Code Cong. & Admin.News p. 1773 et seq.