James E. AKINS, et al., Appellants,

v.

**FEDERAL ELECTION COMMISSION,**
Appellee.

No. 94–5088.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 10, 1995.

Decided Sept. 29, 1995.

As Amended Nov. 1, 1995.

Daniel M. Schember, Washington, DC, argued the cause and filed the briefs for appellants.

David B. Kolker, Attorney, Washington, DC, Federal Election Commission, argued the cause for appellee. With him on the brief were Lawrence M. Noble, General Counsel, and Richard B. Bader, Associate General Counsel, Washington, DC, Federal Election Commission.

Vivien Clair, Attorney, Washington, DC, Federal Election Commission, entered her appearance for appellee.

Before EDWARDS, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

SENTELLE, Circuit Judge:

Appellants sought review in district court of the Federal Election Commission's dismissal of their administrative complaint alleging various violations of the Federal Election Campaign Act, 2 U.S.C. §§ 431–55 (1994). The district court granted summary judgment for the Federal Election Commission. Because we agree that the Commission acted in a reasonable manner in its interpretation and application of the Federal Election Campaign Act as to the administrative complaint, we affirm.

## I. BACKGROUND

James E. Akins, Richard Curtiss, Paul Findley, Robert J. Hanks, Andrew Killgore, and Orin Parker (collectively, "appellants") are former ambassadors, congressmen or government officials. They are politically active people who seek to influence policymakers and the public and who oppose the views of the American Israel Public Affairs Committee ("AIPAC") regarding United States foreign policy in the Middle East.

AIPAC is an incorporated, tax-exempt organization with approximately 50,000 supporters nationwide that lobbies Congress and the Executive Branch for military and economic aid to Israel. AIPAC has an annual budget of close to $10 million. AIPAC's stated purpose is to encourage close relations between the United States and Israel.

On January 9, 1989, appellants filed a complaint with the Federal Election Commission ("FEC" or "Commission"), the independent government agency responsible for enforcement of the Federal Election Campaign Act ("FECA" or "Act"), claiming that AIPAC was a political committee under 2 U.S.C. §§ 431(4) and 431(9)(A)(i) because it made expenditures, including contributions, aggregating in excess of $1,000 in a year for the

purpose of influencing any election for federal office. As a political committee, AIPAC would be subject to registration and reporting requirements involving disclosure of its donors and the amounts it had contributed to candidates, as well as the $1,000 limit for contributions to individual candidates. 2 U.S.C. §§ 433, 434(a)(1) and (b), 441a(1) and (2) (1994).

The FEC investigated the allegations and after a substantial investigation, the General Counsel issued a report regarding AIPAC's corporate expenditures, campaign-related activities and political activities. While the FEC found that AIPAC has made contributions that likely crossed the $1,000 threshold, it concluded that AIPAC is not a political committee under the statute because its campaign-related activities constitute only a small portion of its overall activities and are not AIPAC's major purpose. The FEC stated that AIPAC is primarily a lobbying organization interested in promoting U.S.–Israel relations and its campaign-related activities are undertaken as an adjunct to its lobbying efforts.

Adopting the General Counsel's recommendations, the Commission found that there was no probable cause to believe that AIPAC was a political committee in violation of the disclosure and reporting requirements of sections 433 and 434 of the Act. The Commission did find probable cause to believe that AIPAC violated section 441b, which restricts expenditures and contributions by corporations, but unanimously voted to take no action.

Appellants filed suit in district court claiming that the FEC's final agency action—its determination of no probable cause to believe that AIPAC was a political committee under the Act—was arbitrary, capricious and contrary to law. Appellants allege that the FEC's major purpose standard is contrary to law and that the Commission's findings, reasons, and investigation were insufficient to support its conclusion that there is no probable cause to believe that AIPAC's campaign-related activities were at such a level as to make them a major purpose of the organiza-

tion. The district court granted summary judgment on the basis that the FEC's construction and application of the major purpose standard was proper under the Supreme Court's and this Circuit's interpretations of the Act. The court found no evidence that the Commission failed to investigate adequately appellants' administrative complaint.

## II. DISCUSSION

### A. *Standing*

■ Before addressing appellants' claim on the merits, we must first resolve a jurisdictional issue: whether appellants have standing, both constitutional and prudential, to pursue their claims in federal court at all. In order to establish constitutional standing, appellants "must show injury in fact that is fairly traceable to the defendant's action and redressable by the relief requested." *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 498 (D.C.Cir.1994) ("*ALDF*") (citing *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982)).

Section 437g(a)(1) of FECA allows any person who believes that there has been a violation of the Act to file a complaint with the FEC. In turn, section 437g(a)(8)(A) states that any party *aggrieved* by an order of the FEC dismissing its complaint may file a petition with the U.S. District Court for the District of Columbia.

■ Appellants allege that the FEC's action has denied them their right as citizens, registered voters, and members of the public to obtain information that AIPAC as a political committee would be required to disclose. They contend that their ability to influence and inform policymakers and the public is impaired by the lack of information about AIPAC's contributors and expenditures.[1] While arguably an injury of this type would not appear to meet the requirements of Arti-

---

1. Appellants have also alleged that their ability to compete in the political arena with AIPAC is

weakened without the information. We do not recognize standing on that basis in this case.

cle III standing, a line of circuit precedent, beginning with a footnote in *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079 (D.C.Cir.1973), has recognized certain "informational injuries" resulting from agency action. *Id.* at 1087 n. 29 (finding appellants have standing to challenge AEC decision not to issue environmental impact statement because agency action limited appellants' ability to inform public about social issues and questions of public policy); *see also Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 937–38 (D.C.Cir.1986) (finding organization adequately alleged informational injury in regulations restricting flow of information regarding services available to the elderly); *Foundation on Economic Trends v. Lyng,* 943 F.2d 79, 83–85 (D.C.Cir.1991) (assuming that Agriculture Department's failure to prepare impact statement with respect to germplasm program injured Foundation because its mission is to provide information to its members and general public about such matters, but holding that appellants lacked standing on grounds that they failed to show particular agency action that triggered violation and caused injury). This court recently found informational injuries that satisfied the minimum requirements of Article III standing in *Animal Legal Defense Fund, Inc. v. Espy,* 29 F.3d 720 (D.C.Cir.1994) (finding constitutional standing, but dismissing case for lack of prudential standing); *ALDF,* 23 F.3d 496 (same). Although we acknowledge that this broad approach raises "complex and difficult considerations," *Lyng,* 943 F.2d at 84 (quoting *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1042 n. 6 (D.C.Cir. 1979)), circuit precedent compels that we find that appellants in this case meet the requirements of Article III standing with the informational injury they have alleged.

■ Appellants must also satisfy the prudential prerequisites of standing; they must show that they fall within the statute's "zone of interests" by demonstrating "either a congressional intent to protect or regulate the interest asserted, or some other indication that the litigant is a suitable party to pursue that interest in court." *ALDF,* 23 F.3d at 502 (citations omitted).

Given the broad purposes of FECA, appellants appear to meet this test. Two of the three purposes of the Act's disclosure requirements were intended to serve the information interests of the public, the electorate, and individual voters. These purposes were noted in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976):

> First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office.... Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity.... A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return.

*Id.* at 66–67, 96 S.Ct. at 657 (footnotes omitted). Because appellants allege that they are voters and persons who seek to communicate to policymakers and the public about AIPAC's campaign contributions, their interest in information about campaign contributions falls within the "zone of interests" intended to be served by the statute. While arguably this interest is so generalized as to encroach upon the separation of powers concerns underlying Article III standing requirements, *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 571–78, 112 S.Ct. 2130, 2142–46, 119 L.Ed.2d 351 (1992), to reject standing on that basis would put us at odds with circuit precedent on informational injury as discussed above.

*B. Standard of Review*

■ The district court's grant of summary judgment is subject to *de novo* review. *Petersen v. Dole,* 956 F.2d 1219, 1221 (D.C.Cir.1992). In conducting that review, we must determine anew whether the Commission's dismissal of the portion of appellants' administrative complaint alleging that AIPAC violated the Act by failing to register and report as a political committee is "contrary to law." 2 U.S.C. § 437g(a)(8)(C). It is well settled that judicial review under this provision is limited. *Common Cause v. FEC,* 842 F.2d 436, 448 (D.C.Cir.1988). The Com-

mission's dismissal of an administrative complaint cannot be disturbed unless it was based on "an impermissible interpretation of the Act" or was "arbitrary or capricious, or an abuse of discretion." *Orloski v. FEC,* 795 F.2d 156, 161 (D.C.Cir.1986). *See also FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 44–45, 70 L.Ed.2d 23 (1981) ("*DSCC*").

▮▮▮▮ Appellants bear the difficult burden of demonstrating that the Commission's interpretation was impermissible and contrary to law. The Commission must show only that its disposition of the administrative complaint was "sufficiently reasonable." *DSCC,* 454 U.S. at 39, 102 S.Ct. at 46 (citations omitted). Thus, the Commission's construction of its own statute cannot be disturbed if it is a permissible one. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Under this standard of review, the court will presume that the Commission's action was valid, even if the court would have interpreted the Act in a different manner. *See American Horse Protection Ass'n v. Yeutter,* 917 F.2d 594, 596 (D.C.Cir.1990). Indeed, the Supreme Court has held that the Commission "is precisely the type of agency to which deference should presumptively be afforded." *DSCC,* 454 U.S. at 37, 102 S.Ct. at 45. *Accord Common Cause,* 842 F.2d at 448 ("Deference is particularly appropriate in the context of the FECA....").

### C. Analysis

▮▮▮▮ FECA defines a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A).[2] The Act limits contributions to political commit-

tees, 2 U.S.C. § 441a(a)(1)(C), and requires any organization that qualifies as a political committee to register with the Commission and file periodic reports of all its receipts and disbursements for disclosure to the public. 2 U.S.C. §§ 433 and 434.

The Act defines "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office...." 2 U.S.C. § 431(8)(A)(i). The definition of "expenditure" includes "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value made by any person for the purpose of influencing any election for Federal office...." 2 U.S.C. § 431(9)(A)(i). An expenditure "for a communication expressly advocating the election or defeat of a clearly identified candidate" is a "contribution in kind" unless it is "not made with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate...." 11 C.F.R. § 109.1(a), (c) (1995).

The debate in this case centers around the definition of "political committee" and the FEC's application of the major purpose standard. Appellants argue that the Act's language governing whether an organization making contributions is a political committee depends on a single quantitative standard: if its aggregate contributions are in excess of $1,000 in a calendar year. 2 U.S.C. § 431(4). They assert that because the statutory language is clear, the Commission's interpretation is not entitled to deference under *Chevron.* Appellants also argue that the major purpose test conflicts with the fundamental purposes of the Act, which are to prevent corruption and the appearance of corruption that arise when large contributions are given to secure a political *quid pro quo* from current and potential officeholders. *Buckley,* 424 U.S. at 26, 96 S.Ct. at 638.

---

**2.** Section 431(4) also includes two other definitions of the term "political committee" not pertinent to this case:

  (B) any separate segregated fund established under the provisions of section 441b(b) of the title; or

  (C) any local committee of a political party which receives contributions aggregating in ex-

cess of $5,000 during a calendar year, or makes payments exempted from the definition of contribution or expenditure as defined in paragraphs (8) and (9) aggregating in excess of $5,000 during a calendar year, or makes contribution aggregating in excess of $1,000 during a calendar year or makes expenditures aggregating in excess of $1,000 during a calendar year.

We recognize that the Act has a broad definition of political committee; Congress intended to "address[ ] broadly the problem of political campaign financing," and wanted to "promote full disclosure of campaign-oriented spending" with FECA. *Id.* at 78, 96 S.Ct. at 663. The Commission, however, has construed the words "political committee" narrowly and applied a major purpose standard in determining whether AIPAC was a political committee. Under this narrow interpretation, gleaned from case law, an organization is not a political committee unless, in addition to crossing the $1,000 threshold, it is under the control of a candidate or its major purpose is the nomination or election of a candidate. *Buckley,* 424 U.S. at 79, 96 S.Ct. at 663; *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 252 n. 6, 107 S.Ct. 616, 624–25 n. 6, 93 L.Ed.2d 539 (1986). *Accord FEC v. Machinists Non–Partisan Political League,* 655 F.2d 380, 391–92 (D.C.Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981). A more expansive definition would be constitutionally dangerous due to interference with "fundamental First Amendment interests." *Buckley,* 424 U.S. at 23, 96 S.Ct. at 636; *Machinists,* 655 F.2d at 392.

We agree with appellants that the statutory language is clear in that it broadly defines political committee in economic terms. But our inquiry does not end there. Rather, we must determine whether the Commission acted contrary to law by going beyond the text of the statute to narrow the definition of the term "political committee." To answer this question, we must look to case law interpreting the Act.

In *Buckley,* one of the plaintiffs' claims was that the reporting and disclosure provisions applicable to political committees were overbroad in their application to minor-party and independent candidates and in their extension to small contributions. 424 U.S. at 26, 96 S.Ct. at 638. The Court cautioned that the phrase "for the purpose of ... influencing" an election or nomination in section 431's definition of "expenditure" could raise vagueness problems and "could be interpreted to reach groups engaged purely in issue discussion." *Id.* at 79, 96 S.Ct. at 663. Not-

ing that the lower courts had construed the term "political committee" more narrowly, the Court went on to state that to fulfill the purposes of the Act the term "need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Id.* It further noted that expenditures by political committees can be assumed to fall within the core area Congress sought to address because "[t]hey are, by definition, campaign related." *Id.*

Prior to *Buckley,* at least two lower courts were concerned with the Act's broad-based definition of political committee because it would likely include groups that were not meant to be subject to the restrictions of the Act. *See United States v. National Comm. for Impeachment,* 469 F.2d 1135, 1141–42 (2d Cir.1972) ("*NCFI* "); *American Civil Liberties Union v. Jennings,* 366 F.Supp. 1041 (D.D.C.1973), *vacated on other grounds,* 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975).

In *NCFI* the Second Circuit considered whether a newspaper advertisement was an "expenditure," and whether the National Committee must be deemed a political committee. 469 F.2d at 1138. The court articulated a test that construed "the Act to apply only to committees soliciting contributions or making expenditures the major purpose of which is the nomination or election of candidates." *Id.* at 1141. It concluded that the advertisement was not an "expenditure," but noted that its interpretation of the phrase "for the purpose of influencing ... [an] election" might make "enforcement of the Act ... somewhat more burdensome, as the supervisory officials will be forced to glean the principal or major purpose of the organizations they seek to have comply with the Act." *Id.* at 1142. This test was later adopted by the United States District Court for the District of Columbia in *ACLU v. Jennings, supra.*

Appellants argue that the major purpose test set forth in *NCFI* and *Jennings* is the correct one because it centers on the major purpose of the *expenditure* as opposed to the purpose of the organization itself. We reject this argument for three reasons. First, it is

inconsistent with the language in *NCFI* noting that "supervisory officials will be forced to glean the principal or major purpose of the organizations they seek to have comply with the Act." 469 F.2d at 1142. Second, the statutory definition of "expenditure" includes the requirement that it be made "for the purpose of influencing any election for Federal office," 2 U.S.C. § 431(9)(A)(i), making the test that every expenditure have the major purpose of nomination or election of a candidate and rendering appellants' test a tautology. Third, Supreme Court precedent supports a conclusion that the focus is on the major purpose of the *organization,* rather than the major purpose of individual expenditures by an organization.

For example, in *Massachusetts Citizens,* the Supreme Court again mentioned the major purpose test while discussing whether a small-issue advocacy group could be considered a political committee. 479 U.S. at 262, 107 S.Ct. at 630. The Court found that although the group had made $10,000 in independent expenditures to influence federal elections, it had not violated the restriction on independent spending by corporations contained in section 441b. The Court based its holding on three features of the citizens group, one of which was that its purpose was promoting political activities, not amassing capital.[3] *Id.* at 263–64, 107 S.Ct. at 630–31. The Court further noted that if the group's independent spending became "so extensive that the organization's major purpose may be regarded as campaign activity," then it would be classified as a political committee. *Id.* at 262, 107 S.Ct. at 630 (citing *Buckley,* 424 U.S. at 79, 96 S.Ct. at 663).

This Circuit also adopted a narrow construction to determine whether a "draft group," that is, an organization that seeks to encourage a specific candidate to run for office, is a political committee under FECA. *See Machinists,* 655 F.2d at 394–96. In *Machinists,* we expressed concern about finding a fair reading of the statute that "comports with first amendment safeguards," and recognized the "grave constitutional difficulties

inherent in construing the term 'political committee' to include groups whose activities are not under the control of a 'candidate' or directly related to promoting or defeating a clearly identified 'candidate' for federal office." *Id.* at 393. We declined to extend the term "political committee" to cover draft groups and noted that in doing so we would "avoid the constitutional problems which *Buckley* and its lower court predecessors were able to avoid by narrowly construing the term...." *Id.* at 394. Because we found the Machinists Non–Partisan Political League's activities did not support an existing candidate, it was not a political committee under the Act. *Id.* at 396.

Appellants ask that we disregard both *Buckley* and *Massachusetts Citizens* as mere dicta. However, the scope of our inquiry is limited to the issue of whether the Commission's interpretation of the Act was contrary to law. Thus, even if the Court's discussion of the major purpose test in these decisions was dicta—and we do not necessarily agree—that would not make it an abuse of discretion for the Commission to follow this construction of the Act by the Supreme Court, particularly in light of our decision in *Machinists.* The Supreme Court's dicta may not bind federal courts and agencies, but an agency's reliance on dicta may nonetheless be reasonable. *See generally McCoy v. Massachusetts Inst. of Technology,* 950 F.2d 13 (1st Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992).

■ Although *Buckley* and *Massachusetts Citizens* concern expenditures under the Act, the Court's rationale concerning the constitutional implications of a broad application of the Act to expenditures applies equally to the Act's reach over contributions. A broader construction of "political committee" would likely require advocacy groups to disclose their contributors even though the group is not principally involved in advancing the election or defeat of a candidate. This could raise a First Amendment issue of the sort seen in cases like *NAACP v. Alabama,* 357

---

3. The Court also based its holding on the fact that the citizens group had no shareholders or other persons having a claim on its assets or earnings and that the group was not formed by a

labor union or business corporation, and its policy was not to accept contributions from these entities. *Massachusetts Citizens,* 479 U.S. at 264, 107 S.Ct. at 631.

U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). It is our duty in the interpretation of a federal statute to avoid serious constitutional doubt. *United States v. Rumely*, 345 U.S. 41, 47, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953).

We find that it was reasonable for the Commission to follow the Court's and this Circuit's narrow interpretation of "political committee." Because a judicial gloss on the statute has limited the application of FECA's restrictions for political committees to groups whose major purpose is the nomination or election of a candidate, the FEC's interpretation of the major purpose test was not contrary to law.

■■■ Having established the validity of the Commission's major purpose test, we must next determine whether its application of that test and its determination that AIPAC is not a political committee under the Act was contrary to law. 2 U.S.C. § 437g(a)(8)(C). The Commission determined that AIPAC's campaign-related expenditures, while likely to have exceeded $1,000 in some years, were not its major purpose but were made as an adjunct to, and in support of, the lobbying efforts that were the organization's primary focus. The Commission correctly applied the major purpose test, the concern of which is the core purpose of the organization itself, not the individual expenditure or contribution. We are convinced that the Commission's determination was not so arbitrary or capricious to render it contrary to law.

■■■ Appellants' final and related argument is that the Commission's findings, reasons, and investigation were inadequate to support its conclusion that "only a small portion" of AIPAC's activities are campaign related. They assert that the inadequacy of the FEC's findings, reasons, and investigation preclude affirmance of the Commission's decision. In challenging the extent and techniques of the Commission's investigation, appellants are asking that we review the Commission's exercise of prosecutorial discretion, a sensitive matter within the Commission's expertise. *See Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56, 84 L.Ed.2d 714 (1985). We are mindful that "[i]t is not

for the judiciary to ride roughshod over agency procedures or sit as a board of superintendance directing where limited agency resources will be devoted. We are not here to run the agencies." *FEC v. Rose*, 806 F.2d 1081, 1091 (D.C.Cir.1986).

Under FECA, the Commission enjoys a "broad grant of discretionary power in determining whether to investigate a claim or to bring a civil action...." *Common Cause v. FEC*, 655 F.Supp. 619, 623 (D.D.C.1986), *rev'd on other grounds*, 842 F.2d 436 (D.C.Cir.1988). A review of the General Counsel's report reveals that the Commission conducted a fairly extensive inquiry into appellants' claims, even if it was not as in-depth an investigation as appellants would have liked. The Act does not require the Commission to invoke any particular investigatory techniques, nor does it require the Commission to exhaust every last inquiry. Moreover, appellants suggest no specific areas that the FEC failed to investigate that would have undermined its determination. The Commission has broad discretion to decide whether further investment of resources is worthwhile, *Heckler*, 470 U.S. at 831, 105 S.Ct. at 1655–56, and we defer to its expertise regarding the direction and extent of the investigation. Based on all of the evidence, it was reasonable for the Commission to conclude that campaign-related activities were not a major purpose of AIPAC. There is no evidence that the Commission failed to investigate adequately the administrative complaint.

### III. CONCLUSION

The Commission's interpretation of the statute was permissible, its application of the interpretation was reasonable, and its underlying investigation was adequate. Thus, we are unable to find that the Commission's actions were "contrary to law" or arbitrary, capricious, or an abuse of discretion. The decision of the district court is therefore

*Affirmed.*

SILBERMAN, Circuit Judge, concurring in part and dissenting in part:

Although the FEC did not challenge appellants' standing, we were sufficiently troubled

over our jurisdiction to ask the parties to submit supplemental briefs on the issue. I have come to the conclusion that my colleagues are correct that appellants have standing, but my analysis differs from the majority. I disagree with my colleagues on the merits.

## I.

The dispute over standing turns entirely on whether appellants have established injury in fact. Appellants assert that they compete with AIPAC in lobbying Congress and seeking to persuade the American people on their views of American interests regarding Arab–Israeli disputes. Although appellants do not allege that they make political contributions, it is asserted that AIPAC's secret contributions to congressmen have disadvantaged appellants in this political competition. Of course, many cases in both our court and the Supreme Court have recognized Article III injury when economic marketplace actors assert that a competitor has received a regulatory advantage. *See, e.g., Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 46, 91 S.Ct. 158, 159, 27 L.Ed.2d 179 (1970) (per curiam); *International Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 805–12 (D.C.Cir.1983), *cert. denied sub nom. Breen v. International Ladies' Garment Workers' Union,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984). We have not before now encountered a case in which the competition takes place in the political arena. I am mindful that a plaintiff may not rely for a claimed injury on a mere ideological interest, *see Competitive Enter. Inst. v. National Highway Traffic & Safety Admin.,* 901 F.2d 107, 112 (D.C.Cir.1990), but I think appellants' case must be thought of as akin to one brought by an economic competitor, not to one brought by a litigant who can muster only an ideological interest.

The statute, by requiring any organization that makes or receives campaign contributions or expenditures aggregating over $1,000 per year to register as a political committee and meet certain reporting and disclosure requirements, has the clear purpose of leveling the playing field by reducing the value of campaign contributions and expenditures to both spender and recipient. Any campaign contribution or expenditure is worth less to give and receive if it must be disclosed. It is of less value to the spender because interests adverse to the spender will take notice, and the recipient may be politically pressured to avoid any appearance of *quid pro quo* in policy positions. It is, at the same time, worth less to the recipient because undesirable publicity can be brought to bear on the transaction. And, in any event, the recipient's competitor will notice, and if the competitor should win the spender will not be among his favorite constituents. Essentially, then, a failure of the FEC to require an organization to disclose its contributions is equivalent to *adding* to the value of those contributions. Thus, a candidate running for office is certainly injured if his or her opponent, through the failure of the FEC to require disclosure, is enabled to receive secret contributions. It follows that individuals or organizations that can show that they are competing with the donor or spender on the other side of this political market are similarly injured if the FEC does not require disclosure. Appellants therefore have standing as competitors of AIPAC.

The FEC's primary argument against the application of this reasoning, which, to be sure, is only sketchily presented in appellants' complaint and supplementary brief, is that appellants only compete in the lobbying market with AIPAC, not in actual election campaigns. (AIPAC claims that it does not normally make campaign contributions, and it presumably will no longer do so given the FEC's finding of probable cause to believe that AIPAC violated § 441(b)). But, the lobbying "market" is intertwined with election competition. Many campaign contributors expect that if the candidate should win, he or she will be more inclined to listen to a contributor's views on proposed legislation than would be so if no contribution were made. In this very case, the Commission found that AIPAC's "campaign-related activities and communications [were] undertaken as an adjunct to, and in support of, its lobbying efforts." AIPAC presumably will be a less

effective lobbyist, and the congressmen to whom it contributed will be less likely to present AIPAC's position effectively (if they are so inclined), if AIPAC is required to disclose its contributions.

The Commission relies on *In re United States Catholic Conference*, 885 F.2d 1020 (2d Cir.1989), *cert. denied sub nom. Abortion Rights Mobilization, Inc. v. U.S. Catholic Conference*, 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990), to support its argument that only direct competitors in the campaign election market would have standing to challenge its refusal to require AIPAC to register and disclose. In that case—a rather confusing one—the Second Circuit rejected a challenge brought by pro-choice advocacy groups to the Catholic Church's § 501(c)(3) status under the I.R.S. Code based on the church's illegal campaign expenditures. The court did note that the plaintiffs did not engage in election activity, but it seems clear to me that the case would not have come out differently even if the plaintiffs had been direct electioneering competitors of the church. The federal judiciary has rarely allowed one private party to challenge the tax status of another. *See, e.g., Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40–41, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976). Furthermore, the general advocacy market in which both the church and the plaintiffs were competing is so broad and amorphous as to defy measurement of plaintiffs' injury.[1]

The majority rests appellants' standing on what is sometimes referred to as informational standing—that appellants are injured by failing to receive information that the government should compel AIPAC to disclose. That approach is problematic here because recognition of informational standing in this case allows a generalized, undifferentiated interest in information to satisfy Article III requirements. "Informational injury" confers standing only in narrowly defined circumstances. It was first mentioned in a footnote in *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1086 n. 29 (D.C.Cir.1973) (*SIPI*).[2] We recognized that the AEC's decision not to provide an impact statement on a reactor program established Article III injury because the Institute's main function was to distribute such information to the public. Similarly, we determined informational injury satisfied Article III in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937 (D.C.Cir.1986), *vacated on other grounds*, 494 U.S. 1001, 110 S.Ct. 1329, 108 L.Ed.2d 469 (1990), where new government regulations restricting the availability of information on services for the elderly impaired AASC's ability to provide information, counseling and referral services for its members. By contrast, in *Competitive Enter. Inst.*, 901 F.2d at 122–23, the plaintiff organization lacked informational standing because it failed to show how the NHTSA's decision not to issue an EIS significantly diminished its ability to disseminate information or to continue its activities.

Two cases relied on by the majority to find informational standing are not determinative. In *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 84 (D.C.Cir.1991), we only assumed that the organization's alleged injury—the Foundation's diminished ability to provide information to its members and the public due to the Agriculture Department's failure to prepare an EIS—was sufficient to confer informational standing without resolving the issue, because there was no prudential standing. We suggested, however, that informational injury alone is insufficient to establish Article III standing. We worried

---

1. Of course, as the Commission indicates, the appellants are in one sense seeking a more severe sanction for AIPAC's illegal expenditures than the FEC determined was appropriate, but that does not undermine their standing. Under most statutes, this sort of action could not be brought because of *Heckler v. Chaney's* bar on judicial review of an agency's nonenforcement decision. 470 U.S. 821, 831, 105 S.Ct. 1649, 1655–56 (1985). But this statute squarely directs review of the Commission's determination. *See*

§ 437(g)(8)(c) ("In any proceeding under this paragraph the court may declare that the [FEC's] dismissal of the complaint or the failure to act is contrary to law.").

2. The footnote was subsequently declared "unnecessary to the decision." *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 83 (D.C.Cir. 1991).

that a broad definition of informational standing would controvert the separation of powers principles enunciated in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and would allow plaintiffs to manufacture standing every time an agency was not creating information a member of the public would like to have. *Lyng,* 943 F.2d at 84–85. And in *Animal Legal Defense Fund, Inc. v. Espy,* 23 F.3d 496, 501 (D.C.Cir.1994), the decision merely asserted without discussion that Article III requirements were met by informational injury—the Fund's impaired ability to gather and disseminate information on laboratory conditions under the Agriculture Department's definition of "animal"—before going on to find no prudential standing.

Thus, under our precedent, "informational injury" satisfies Article III requirements only when the plaintiff is able to demonstrate an actual, concrete injury, that impinges on the plaintiff's daily operations or makes normal activities infeasible, and that is caused by the lack of access to particular information. To call appellants' injury an informational one is to accept their alternative claim that they are entitled to AIPAC's disclosures merely because they are members of the voting public. This sort of general interest cannot suffice to show Article III injury. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572, 112 S.Ct. 2130, 2142, 119 L.Ed.2d 351 (1992); *Sierra Club,* 405 U.S. at 739, 92 S.Ct. at 1369; *Allen v. Wright,* 468 U.S. 737, 760–61, 763, 104 S.Ct. 3315, 3329, 3331, 82 L.Ed.2d 556 (1984). If, instead, appellants' interest is thought more "particular" because of their political positions and their lobbying interests, then the claim of informational in-

jury really reduces to the competitive injury claim. Thus, as I analyze appellants' injury, it is the Commission's failure to require AIPAC to disclose to the world its past campaign expenditures that disadvantages appellants—not appellants' inability to themselves gain that information.[3]

## II.

Section 431(4)(A) defines "political committee" solely in terms of "expenditures" and "contributions": a political committee is "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." "Contribution" is defined in turn by § 431(8)(A)(i) as "any gift, subscription, loan, advance, or deposit of money or anything of value, made by any person for the purpose of influencing any election." "Expenditure" is defined in similar terms by § 431(9)(A)(i) as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election."

The FEC tacitly concedes that the language of § 431(4)(A) is unambiguous and sets clear requirements for classification as a political committee, but asserts that the Supreme Court has narrowed the reach of the statutory language in response to First Amendment concerns. The FEC relies on language in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL* ), in claiming that

**3.** Plaintiffs in this case clearly meet prudential standing requirements in that they are within the statutory "zone of interest." *See Clarke v. Securities Indus. Ass'n,* 479 U.S. at 394–99, 107 S.Ct. at 754–57; *Animal Legal Defense Fund,* 23 F.3d at 503. As the majority notes, FECA's purposes are broadly stated. But FECA's "zone of interest" cannot, as the FEC asserts, include only individuals' interests as *voters* and not individuals' interests as both *competitors* and *voters.* The logical implication of the FEC's argument is that prudential standing exists (as a "pure" voter) only where Article III standing is precluded (as a general interest under *Lujan*), so that no one would have standing. This result is absurd.

Clearly a direct competitor of a political candidate, as the party most directly injured by improper campaign activities, is within the zone of interests intended to be protected by the statute. Thus, the statutory zone of interest is not limited to voters, but includes other political interests as well.

Moreover, FECA's broad language may in fact make a prudential standing inquiry irrelevant. If all voters are beneficiaries of the statute and are thus "aggrieved" within the meaning of § 437(g)(8), Article III always would impose a more restrictive standard, such that meeting Article III requirements alone would establish standing.

an organization should only be classified as a political committee if—in addition to exceeding the $1,000 contribution or expenditure limits—the *organization's* major purpose is the nomination or election of a candidate or the organization is controlled by a political candidate, *i.e.*, the so-called major purpose test.[4] This interpretation of "political committee" is owed deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Appellants respond by asserting that the statutory language is clear, and that it has not been narrowed by the Supreme Court. Tracing the development of the term "major purpose," appellants argue that the test is properly employed to determine whether an organization's independent disbursements constitute "expenditures" within the meaning of § 431(9)(A)(i), *i.e.*, whether they are "made ... for the purpose of influencing any election," such that they count toward the $1,000 limit defining political committee status. *Buckley* and *MCFL* endorse this test; any references to the major purpose of an organization, rather than an expenditure, merely establish the presumption that the expenditures of an organization the major purpose of which is election activity will fall within the statutory definition. Further, *MCFL* noted that independent expenditures raise more serious First Amendment concerns and therefore require more compelling justification for government restrictions, than do contributions like those made by AIPAC here. Appellants point out that the FEC's major purpose test has the anomalous result of allowing large organizations that spend only a small portion of their budgets on direct campaign contributions to avoid the requirements placed on political committees, undermining FECA's emphasis on disclosure as a means of curbing the threat or appearance of election abuse.

The FEC's assertion that its interpretation of "political committee" is entitled to deference is simply wrong. It is undisputed that the statutory *language* is not in issue, but only the gloss put on this language by Supreme Court decisions. We are not obliged to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other case. Appellants thus do not bear "the difficult burden of demonstrating that the Commission's interpretation was impermissible and contrary to law," Maj.Op. at 352; they need only show that their interpretation better reflects the statutory language and purpose, as interpreted by the Supreme Court, than does the FEC's.

While there is language in *Buckley* and *MCFL* that can literally be read to support the FEC's position, both cases focused on the constitutional concerns raised by *independent expenditures*. Independent expenditures are the most protected form of political speech because they are closest to pure issue discussion and therefore farthest removed from the goal of preventing election corruption. *Buckley*, 424 U.S. at 19–23, 78–81, 96 S.Ct. at 635–37, 663–64; *MCFL*, 479 U.S. at 259–60, 107 S.Ct. at 628–29. They raise graver First Amendment concerns because it is difficult to determine when an expenditure is independent—rather than coordinated with or by a particular candidate—and regulation therefore risks chilling protected speech.

Thus, in *Buckley* the Supreme Court determined that expenditure limits are more likely to violate the First Amendment because they place substantial and direct restrictions on the ability to engage in political speech. *See Buckley*, 424 U.S. at 39–59, 96 S.Ct. at 654. Contribution limitations, on the other hand, raise fewer constitutional concerns, it was thought, because they serve the basic governmental interest of protecting the electoral process *without* restricting political debate and discussion. *See id.* at 28, 96 S.Ct. at 639 (such limits "focus[ ] precisely on the problem of large campaign contributions— the narrow aspect of political association where the actuality and potential for corruption have been identified"); *see also id.* at

---

**4.** This is apparently the first time the FEC has formulated this test; it has pointed to no Advisory Opinion that articulates either explicitly or implicitly a major purpose test, even 10 years after the Supreme Court cases on which it primarily relies—*Buckley*, 424 U.S. 1, 96 S.Ct. 612, and *MCFL*, 479 U.S. 238, 107 S.Ct. 616—supposedly imposed this test on the definition of political committee.

23–38, 96 S.Ct. at 636–44. To support its major purpose test, the FEC relies on the Court's discussion of § 434(e), which imposes disclosure requirements on "[e]very person" making contributions or expenditures exceeding $100.[5] The Court rejected the claim that § 434(e) imposed burdens that would deter individuals "from making expenditures for their independent political speech." *See id.* at 74–75, 96 S.Ct. at 661. It was determined that "contributions"—when defined as direct or indirect contributions to a candidate, political party, or campaign committee, or expenditures placed with the cooperation or consent of a candidate—"have a sufficiently close relationship to the goals of the Act," and therefore limits on them are constitutional. *Id.* at 76, 96 S.Ct. at 662. The Court noted that the meaning of "expenditure," however, posed line-drawing difficulties because it created the danger of "encompassing both issue discussion and advocacy of a political result." *Id.* at 77, 96 S.Ct. at 662. Therefore, the reach of § 434(e) was limited by "constru[ing] 'expenditure' for purposes of that section ... to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. at 664. Coming in the midst of its analysis of the scope of "expenditures," the Court's language that apparently refers to the major purpose of an organization is at best ambiguous:

> To fulfill the purposes of FECA [political committees] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. *Expenditures* of candidates and of "political committees" *so construed* can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

**5.** Section 434(e) has subsequently been amended and is now § 434(c): "Every person (other than a political committee) who makes independent expenditures in an aggregate amount or value in excess of $250 during a calendar year" shall be subject to certain reporting and disclosure requirements. 2 U.S.C. § 434(c) (West 1985 & Supp.1995).

**6.** *Buckley* cited both *United States v. National Comm. for Impeachment,* 469 F.2d 1135 (2d Cir.

*Id.* at 79, 96 S.Ct. at 663 (emphasis added).[6] When parsed carefully, this wording does not support the FEC's major purpose test for "political committee" status as applied to contributions. Perhaps the best interpretation of this language is that an *organization* controlled by a candidate or the major purpose of which is election-related will presumptively have *expenditures* falling within the statutory definition. In any event, the Court clearly distinguished *expenditures* and *contributions* and referred to a "major purpose" test only with regard to the former.

While certain language in *MCFL* can also be read to support the FEC's position, the Court was again addressing First Amendment problems with the regulation of *independent expenditures.* The Court held that § 441(b), which prohibits corporate contributions or expenditures "in connection with any election," was unconstitutional as applied to MCFL, a non-profit advocacy group that had made independent expenditures violating § 441(b). The Court's concern was that the reporting and disclosure requirements of FECA might discourage protected political speech of advocacy groups. *See id.,* 479 U.S. at 253–56, 107 S.Ct. at 625–27. While *MCFL*'s references to the major purpose of an organization may thus have relevance for the issue of when *independent expenditures* suffice to establish political committee status, *MCFL* does not control cases involving contributions or coordinated spending. The Court's analysis clearly distinguishes contributions and expenditures: "should MCFL's *independent spending* become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee." *Id.* at 262, 107 S.Ct. at 630 (quoting *Buckley,* 424 U.S. at 79, 96 S.Ct. at 663)

1972) and *American Civil Liberties Union, Inc. v. Jennings,* 366 F.Supp. 1041 (D.D.C.1973) (three-judge court), *vacated as moot sub nom. Staats v. American Civil Liberties Union, Inc.,* 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975), as developing this "major purpose" test. These two cases applied a "major purpose" test to determine whether a particular disbursement was "made ... for the purpose of influencing any election" under § 431(9)(A)(i).

(emphasis added).[7] As in *Buckley*, this language can plausibly be read as merely creating a presumption that certain organization's expenditures are "made ... for the purpose of influencing any election." Also as in *Buckley*, the underlying concern is that congressional regulation, in its effort to achieve full disclosure, may impermissibly discourage protected independent expenditures. In short, the Court's rationale in *MCFL* and *Buckley* is simply inapplicable to the present case. There is no longer a constitutional problem with applying § 431(4)(A) to AIPAC or to other organizations making campaign *contributions* exceeding the statutory limits.

The FEC's conception of the major purpose test does not make this distinction between expenditures and contributions, and it therefore imposes an unduly narrow definition of "political committee."[8] It allows a large *organization* to contribute substantial sums to campaign activity, as long as the contributions are a small portion of the organization's overall budget, without being subject to the limitations and requirements imposed on political committees. This ignores the $1,000 limit in § 431(4)(A)'s definition of "political committee," even in the absence of significant First Amendment concerns with regulating contributions. Moreover, that such an organization may be limited by other provisions of FECA as well is irrelevant. There is no indication that Congress intended to limit one section in light of others or to make their application mutually exclusive. Various provisions impose different, if overlapping, limits and requirements on organizations; these differences represent the sound exercise of congressional judgment as to the various degrees of risk to the election process posed by certain activities. While the FEC's "major purpose" test may therefore be valid in determining whether an organization making independent expenditures is subject to the requirements imposed on "political committees," it cannot legitimately be used to place contributions exceeding $1,000 outside the scope of § 431(4)(A)'s definition of "political committee."

There is no contention that AIPAC's disbursements were independent expenditures, so there is no constitutional barrier to application of § 431(4)(A)'s plain terms. The FEC found that AIPAC likely made direct campaign contributions in excess of $1,000. The FEC's decision that no probable cause existed to believe AIPAC was a political committee, and its consequent dismissal of appellants' complaint, were therefore based on its mistaken interpretation of § 431(4)(A). This error requires that we reverse the dismissal of the complaint and remand to the FEC for further consideration—and if necessary further investigation[9]—of AIPAC's status. I respectfully dissent.

---

7. Of the Court's two references to a major purpose test, the first was joined by only a plurality of Justices. The second, quoted here, was joined by Justice O'Connor, whose concurrence emphasized that *Buckley* still applied and that disclosure requirements for independent expenditures were generally valid. *Id.*, 479 U.S. at 265–66, 107 S.Ct. at 631–32.

8. Contrary to the FEC's assertion, we did not endorse its "major purpose" test in *Federal Election Comm'n v. Machinists Non–Partisan Political League*, 655 F.2d 380 (D.C.Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981). In *Machinists*, we held that "draft groups" that promoted the acceptance of particular individuals prior to their actual nomination did not fall within § 441(a)'s definition of political committee because the expenditures and contributions were not made to a "candidate." *Id.*

at 296. While our language suggested that it is not the "purpose" of the organization itself but of its disbursement (its "activities") that is relevant to determining whether a group is a political committee, our decision was based on Congress' expressed intent to exclude draft groups from the definition of political committee. *See id.* at 394–96.

9. Appellants alternatively claimed that the FEC's investigation was inadequate. The FEC's decisions on how and to what extent to investigate, while reviewable, command substantial deference. *Cf. Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (judicial review particularly circumscribed in area of prosecutorial discretion); *Federal Election Comm'n v. Rose*, 806 F.2d 1081, 1091 (D.C.Cir.1986) (courts have limited role in supervising agency use of limited resources). And the statute imposes no

particular investigatory techniques or obligations. Here, even though appellants note several leads that the FEC could have pursued more vigorously, the investigation probably passes the minimal level of sufficiency. To require a full-blown court examination of each investigatory decision would intrude too deeply into the FEC's proper area of authority. Moreover, under the circumstances of this case, the factual findings already made by the FEC indicate that AIPAC should be classified as a political committee.